## VIRGINIA FREIGHT LINES, INC., ETC. *v.* MONTGOMERY

[No. 88, September Term, 1969.]

*Decided December 23, 1969.*

222

The cause was argued before BARNES, MCWILLIAMS, FINAN, and SINGLEY, JJ. and CHARLES E. ORTH, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*George J. Goldsborough, Jr.,* with whom was *K. Thomas Everngam* on the brief, for appellant.

*Ernest M. Thompson,* with whom was *Dorothy H. Thompson* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

This is not a real fish story—but it does concern a load of menhaden and a head-on collision in which, incredibly, no one was hurt. On 6 May 1966, appellant's tractor-trailer loaded with 15 tons of that inedible species *(Brevoortia tyrannus)* was southbound on U. S. Route

301 in Queen Anne's County. At about 4:30 p.m. it had reached a point where the highway, normally dual, had been reduced to a single lane, 24 feet wide, because of construction on the other side of what is now the median strip. The straight, level, dry road was bordered by "fairly hard" shoulders ranging in width from six to eight feet. The weather was "clear;" the surrounding area was described as "open country."

In his 15 years of service as a driver for the appellant 41 year old Asa Nickens had never before been involved in an accident. He testified that for about three miles he had been following a "straight" (no trailer) truck at a distance of about "three to five hundred feet," and at a speed he estimated to have been "about" 40 miles per hour. As he put it:

> "Well, this straight job started slowing up and then suddenly pulled over on the shoulder and I moved up beside him to pass, then I saw this car [Montgomery] coming up in my lane, I applied the brakes and the car didn't seem to be moving in either lane so at the last minute, I couldn't go to the right, I had to veer away to the left and that is when my right front wheel hit the right front wheel of the car."

He said he could not see the appellee (Montgomery) until the truck in front of him had "whipped off" on to the shoulder and that at that moment Montgomery was "less than 150 feet away" moving at a speed he could not estimate. He did not try to turn to the right because he judged he would not have cleared the straight truck which was then alongside him on the shoulder. The point of impact was near the center line on Nickens' side of the road but after the collision his truck crossed the northbound lane and came to rest on the shoulder. Montgomery's car wound up on the shoulder of the southbound lane.

Nickens dismounted from the high cab of his truck and

went to look after Montgomery who admitted he had been on the wrong side of the road. He blamed "road hypnosis" adding that he had been "under the delusion * * * [he had been] on a four-lane divided highway." He said he had been trying to get back on his side of the road when the collision occurred. It was then Nickens discovered that the straight truck had left the scene.

Trooper Conley happened along shortly after the collision. He testified that Nickens' truck had laid down skid marks beginning on the southbound lane and running "150 feet" to the point of impact which "from the debris and the oil" he judged to be about at the center line. The skid marks made by Montgomery, some 80 feet in length, indicated to the trooper that Montgomery "was in the process * * * of going back into his lane." He said Montgomery told him he had been "on the wrong side of the road."

On 29 July 1968 appellant filed suit against Montgomery in the Circuit Court for Queen Anne's County alleging damage to its tractor-trailer in the amount of $4,-813.56. The case came on for trial before Carter, C.J., sitting without a jury, on 7 October 1968. In addition to the testimony of Nickens, Montgomery and Trooper Conley, there were admitted into evidence the trooper's accident report and a statement given by Nickens to appellant's insurer on 24 May 1966, an edited version of which follows:

> "Virginia Freight Line
> 5-24-66
> * * *
>
> "I am Asa S. Nickens, 41, of Kilmarnock, Va., and I have been a driver for this Company for over 15 years, and I have not been involved in any previous serious or fatal accidents during that time. On Friday, May 6, 1966 about 4:30 p.m. I was driving unit #57 South on U.S. 301 about one mile North of State route 405 in Queen Anne County, Maryland, when a headon collision occurred as I braked and swerved

sharply *to avoid a rearend accident with a straight truck which was also headed South in the same traffic lane.* The truck ahead had dodged to his right suddenly and without warning in order to avoid striking headon a 1964 Chevrolet sedan which was coming towards us on our side of the road. We were driving in a construction zone and two-way traffic was running on the half of the divided 4 lane highway which is normally used by Northbound traffic only. * * * The Chevrolet sedan was directly in front of me as I swerved to the left, and I could not avoid a collision although I tried to miss the car, but the right front of the Chevrolet ran under the right front of the White sleeper cab tractor. * * * I was driving carefully, and observing traffic conditions, but naturally I could not see the oncoming car because the truck ahead of me blocked the vision of the right lane for some distance ahead. * * *." (Emphasis added.)

The trooper's testimony was in the main a repetition of the data contained in the accident report.

As Judge Carter put it the only question was whether Nickens was guilty of contributory negligence and in finding that he was he applied the rule announced in *Cocco v. Lissau*, 202 Md. 196, 199 (1953). Judge Delaplaine, for the Court, said:

"A driver who violates this 'rule of the road' [Code, Art. 66½, § 217 (1967 Repl. Vol.) requiring vehicles to be driven upon the right half of the roadway] is *prima facie* guilty of negligence where the violation directly and proximately causes a collision and injury to another traveler on the road, and the burden is then cast upon the driver to overcome the presumption of negligence by showing that under the circumstances, such as the condition of the road

*or an emergency in the traffic,* he was justified in driving in the center or upon the left half of the road." (Emphasis added.)

Appellant insists there is "no evidence in the record" to support a finding that Nickens violated the statute. This was rejected by the trial judge and rightly so, we think. To overcome the presumption of negligence, therefore, appellant must show that Nickens was justified in leaving the southbound lane. His justification, if any, must lie in whether he was confronted with an emergency.

Judge Carter, in concluding that Nickens was not confronted with such an emergency, said he was "unable to place sufficient credence in \* \* \* [Nickens'] testimony to find that he has shown thereby or otherwise by the evidence that an emergency condition existed so as to overcome the prima facie case against him of contributory negligence \* \* \*." He said the statements given by Nickens "as to how the accident happened are irreconcilable." There are indeed some inconsistencies in the evidence but we do not agree that they loom so large as to warrant the conclusion that he was not confronted with an emergency justifying his action, and we think Judge Carter was clearly in error in so holding.

As a general rule, the fact that a witness has made a statement on a previous occasion which is inconsistent with or which contradicts his testimony at trial does not render his testimony nugatory, although it may be considered as bearing on his credibility. *See, e.g., Crunkilton v. Hook,* 185 Md. 1, 5 (1945). Also, a witness whose testimony has become suspect by a showing of prior inconsistent statements may rehabilitate himself by offering evidence of other statements made by him which accord with his testimony or by explaining the reasons for any such inconsistencies. *See, e.g., American Stores Co. v. Herman,* 166 Md. 312 (1934).

Judge Carter found that the version given by Nickens to the insurance company as to how the accident occurred and that offered at the trial were inconsistent. According

to him Nickens indicated in his statement that "* * * he cut his [vehicle] sharply to the left in order *to avoid a rear end collision with the straight truck* [and] [i]n his testimony two years later, he explains the cause of his swerving to the left was *to avoid a head-on collision with the defendant's car.*" Appellant argues that the first version has been read out of context and that taken as a whole, the statement is not inconsistent with Nickens' testimony. We agree that the inconsistency is not serious if the statement set forth earlier is read as a whole. *See* 98 C.J.S., *Witnesses* § 583 at 558-59 (1957). Moreover, we also find that Nickens' testimony was "rehabilitated" by the testimony of Trooper Conley whose version as to how the accident occurred seems to us to corroborate the version offered by Nickens at the trial. We might add also that Nickens, by way of explaining any inconsistencies, testified that the statement was actually written by a representative of the insurance company whose reference to a possible rear end accident with the straight truck was inaccurate.

Although Judge Carter found a few additional "inconsistencies" and "contradictions" we think, all things considered, that Nickens did react to an emergency traffic condition which arose because Montgomery was driving his car in the wrong traffic lane.

There now arises the question whether Nickens breached the standard of care owed under the circumstances noted above. The question was not reached by the trial judge in view of his finding that emergency conditions were not present. The emergency rule was discussed at length in *Warnke v. Essex*, 217 Md. 183 (1958), where Judge Horney, for the Court, said:

> "Generally, the operator of an automobile who suddenly finds himself in a position of peril is not required to exercise the same care as when he has ample time to reflect upon the course of action he should pursue. *Burhans v. Burhans,* 159 Md. 370, 150 A. 795 (1930). * * *.

"The relevant inquiry, then, is whether an ordinarily prudent person would have acted in the same manner as the defendant did in this case. The mere fact that a person finds himself in a predicament or emergency does not automatically relieve him of the obligation to use ordinary care. The amount of care might change, of course, but the degree or standard of *ordinary care* is always the same, *i.e.*, the care that would be used by an ordinarily prudent person under the same circumstances, the emergency itself always being considered and weighed as one of the circumstances. See 2 *Harper and James, Law of Torts* (1956), § 16.11, and *Prosser, Torts* (1955), § 32." *Id.* at 186-87.

In our judgment the tactic employed by Nickens to avoid Montgomery's oncoming car was what a reasonably prudent man might have done under the same or similar circumstances. Nickens' testimony that he could not stop his truck in time to avoid Montgomery was uncontradicted. Thus, as we see it, Nickens had two ways to extricate himself from his "position of peril." He could have pulled over onto the right shoulder or he could have done what he chose to do. The first way, according to Nickens, was denied to him because it was blocked by the straight truck. Thus, assuming his testimony to be true, and it was not denied, we have no difficulty concluding that by swerving to the left, Nickens did only what any reasonably prudent man would have done faced with a like emergency. Nor would our conclusion differ had we assumed, for the sake of argument, that Nickens' access to the right shoulder was not blocked as he claimed. In *Mason v. Triplett*, 217 Md. 433 (1958), the plaintiff sued for damages sustained as a result of a head-on collision with the defendant. The evidence there was much like the case at bar. The plaintiff had been driving north on a two-way street; the defendant had been driving south. There were six foot gravel shoulders

on each side. The plaintiff noticed that the defendant was driving towards him on the wrong side of the street and at the last minute he braked and swerved to his left leaving skid marks 50 to 60 feet in length. The skid marks showed that the plaintiff had swerved over to the center of the road. The defendant said he had started to go back over to the proper lane when the impact occurred. He contended at trial that the plaintiff was contributorily negligent in turning to the left instead of pulling off to the right. Judge Henderson (later Chief Judge), for the Court, rejected the defendant's argument; he said:

> "The appellees contend that several inferences of negligence on the part of Mason can be drawn from the testimony and the physical facts. We do not agree. The uncontradicted evidence is that Mason was on his proper side of the road, when suddenly he saw a vehicle on the wrong side of the road, with very dim lights, which had backed out of a side road and started south at an accelerated speed directly in his path. These dim lights would not have been visible to Mason until Roy started south. We think the proximate cause of the accident was the extraordinary and quite unforeseeable conduct of Roy. *If, as the appellees contend, Mason might have avoided the collision at the last moment by driving off the road to the right, instead of turning to the left, and we think this is only a matter of speculation, his action in swerving to the left at the last moment could hardly be deemed negligent.* Cf. *Kaline v. Davidson*, 146 Md. 220, 224. As we said in *Williams v. Dawidowicz*, 209 Md. 77, 83, 'The only emergency was the one created by Williams, which put Aiudi to a choice of stopping or pulling to the right or left'; citing *Baker v. Shettle*, 194 Md. 666, 671, where we said: '* * * what might ordinarily be negligence in a case where no emergency exists, may not be

negligence in the case of an emergency. In such a situation one does not have time to think what is the best thing to do; the emergency occurs so quickly that it would be unjust to apply the rule which governs in the ordinary case.' In *Coastal Tank Lines, Inc. v. Canoles,* 207 Md. 37, 44, we said: 'Time and a reasonable opportunity to avoid an imminent danger is an essential element here, as it is under the doctrine of last clear chance.' Similar arguments as to a wrong choice in an emergency, were advanced, without success, in *Coastal Tank Lines v. Carroll,* 205 Md. 137, *Brehm v. Lorenz,* 206 Md. 500 and *Burhans v. Burhans,* 159 Md. 370." *Id.* at 438. (Emphasis added.)

Judge Carter was overtly skeptical that there was ever a straight truck in front of Nickens. He said:

"In addition we have the suspect circumstance of a *phantom* straight truck whose driver pulled off the road and stopped seconds before the collision, disappearing in a situation involving a serious collision which occurred in his presence, allegedly without his fault, in broad daylight, on a busy thoroughfare, which is an unusual and unlikely occurrence to say the least." (Emphasis Judge Carter's.)

It must indeed be conceded that the disappearance of the "phantom" truck was both "unusual and unlikely" but that this may have been so hardly justifies discarding Nickens' testimony in this regard, especially in light of the trooper's testimony. He said, in part:

"I can't remember if he said it [a truck] was in front of him or parked at the side or what but he was following a truck * * *. There was no truck found on the road."

* * *

"[B]ut he did say that there was a truck there,

I don't know if it was parked or if it was in front of him. I don't recall, sir.

"Q. You didn't ask? A. No sir, I guess I didn't."

Moreover, Montgomery seems not to have challenged this phase of Nickens' testimony although he was present during the trial. Why no one asked him about the "phantom" truck has not been divulged. We think it is at least likely that the driver of the "phantom" truck may have had urgent reasons for not wanting the presence of himself or the truck established at the scene of the collision. There comes immediately to mind the possibility that he had stolen the truck or that it was loaded with contraband of one kind or another.

Counsel for Montgomery make much of Nickens' violation of the statute, Art. 66½, § 217, *supra*, which seems to us to be another way of saying that he should have stayed in the southbound lane. Had he done so Montgomery might have succeeded in escaping to the northbound lane but it seems to us more probable that he would have failed and that his failure could very well have been fatal.

For what has been said the judgment for costs will be reversed and, pursuant to Maryland Rule 875 a, we shall enter judgment for the appellant for $4,813.56. Costs in the trial court and in this Court will be paid by the appellee.

> *Judgment reversed.*
>
> *Judgment in favor of the appellant against the appellee entered for $4,813.56.*
>
> *Costs in this court and in the trial court to be paid by the appellee.*